673 F.2d 1076
 CENTRAL LINCOLN PEOPLES' UTILITY DISTRICT, et al., Petitioners,
Public Power Council, et al., Petitioner-Intervenors,
v.
Peter JOHNSON, as Administrator of the Bonneville Power
Administration, Department of Energy, et al., Respondents,
Aluminum Company of America, et al., Respondent-Intervenors.
 No. 81-7561.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 6, 1982.
Decided April 6, 1982.
 
 James T. Waldron, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., for petitioners.
 
 
 1
 Jack G. Collins, Portland, Or., Eric Redman, Seattle, Wash., Alvin Alexanderson, Portland, Or., argued for respondents; Peter Johnson, Bonneville Power Adm'r, Portland, Or., James Edwards, Secretary of Energy, Dept. of Energy, Washington, D. C., on brief.
 
 
 2
 James C. L. Baxendale, Portland, Or., for intervenor Portland Gen. Elec. Co.
 
 
 3
 William David Sprayberry, Vancouver, Wash., for intervenor Public Power Council.
 
 
 4
 Barton L. Kline, Boise, Idaho, for intervenor Idaho Power Co.
 
 
 5
 Robert E. Sullivan, Butte, Mont., for intervenor Montana Power Co.
 
 
 6
 John Wiley Gould, Portland, Or., for intervenor CP Nat. Corp.
 
 
 7
 Allan Hart, Portland, Or., for intervenor Staffer Chemical Co. and Elkem Metals Co.
 
 
 8
 George M. Galloway, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., for intervenor Pacific Power & Light Co.
 
 
 9
 William S. Weaver, Donald G. Kari, John D. Ballbach, Perkins, Coie, Stone, Alsen & Williams, Seattle, Wash., intervenors for Puget Sound & Power Co.
 
 
 10
 Before BROWNING, Chief Judge, and WALLACE and BOOCHEVER, Circuit Judges.
 
 OPINION
 BOOCHEVER, Circuit Judge:
 
 11
 This case concerns the allocation of power under the newly enacted Pacific Northwest Electric Power Planning and Conservation Act, Pub.L.No. 96-501, 94 Stat. 2697 (1980) (the Act). Public utility customers of the Bonneville Power Administration (BPA) contend that the power contracts offered to BPA's industrial customers violate those provisions of the Act that give preference to public utilities in the allocation of power. Because we find no explicit exception to the unambiguous provisions of the Act that preserve the longstanding preference given to public utilities, we find the contracts invalid.
 
 FACTS
 
 12
 BPA is the federal agency that markets federal hydroelectric power in the Pacific Northwest. Congress passed the Act to resolve competing claims to low-cost federal power. See, e.g., H.R.Rep.No. 976 (Part II), 96th Cong. 2d Sess. 26 (1980) U.S.Code Cong. & Admin.News 1981, pp. 10052, 10113. The Act requires BPA to offer long-term contracts to all of its customers. BPA offered contracts to its direct service industrial customers (DSIs) on August 28, 1981. These contracts are the first to be offered under the Act and the first to be adjudicated.
 
 
 13
 BPA provides DSIs 'Industrial Firm Power' which allows BPA to restrict its delivery of power to the DSIs for specified reasons. Each quartile, or fourth, of the DSI power is subject to different restrictions. The first quartile is served partially with nonfirm energy, the energy remaining after BPA has fulfilled its firm obligations. Nonfirm energy is the energy in excess of that which BPA can reliably plan on producing and is therefore provided only when such an excess exists.[1] Firm energy is the energy that BPA can reliably plan on producing and must be sufficient to serve BPA's firm loads. Firm loads are the power requirements that BPA must plan for and may not restrict.
 
 
 14
 Prior to the Act, BPA offered nonfirm energy first to the preference customers and then to the DSIs. Under the new contracts, BPA plans to offer nonfirm energy to the DSIs first. The preference customers challenge the contract provisions that effectuate this new method of allocation.[2]
 
 ANALYSIS
 I.
 Applicable Standards
 
 15
 Section 9(e)(5) of the Act provides that suits to challenge final actions such as contract offers shall be brought in the United States Court of Appeals for the region. The original jurisdiction given this court by Sec. 9(e)(5) raises procedural problems that will have to be resolved on a case-by-case basis. Because no factfinding is necessary in this case, we will treat it like a petition for administrative review. A myriad of variations may arise in suits brought under the Act, and we do not intend to bind the court to the procedures used in this case.
 
 
 16
 Section 9(e)(2) of the Act provides that the scope of review by this court of a sale of electric power is governed by the Administrative Procedure Act, 5 U.S.C. Sec. 706. The Administrative Procedure Act specifies that in reviewing agency actions, a court shall decide all relevant questions of law, interpret statutory provisions, and determine the applicability of the statutory terms to agency action. The reviewing court must set aside agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Id. Sec. 706(2)(A).
 
 
 17
 In interpreting the Act, we give substantial deference to BPA's construction of the statute because BPA is the agency charged with the Act's administration. United States v. Rutherford, 442 U.S. 544, 553, 99 S.Ct. 2470, 2475, 61 L.Ed.2d 68 (1979). This deference is especially appropriate because BPA's interpretation is a contemporaneous construction of a statute by those with the responsibility for setting it in motion. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Columbia Basin Land Protection Association v. Schlesinger, 643 F.2d 585, 600 (9th Cir. 1981). Additional weight is given the agency interpretation when the agency administrators participated in drafting the legislation as they did here. Zuber v. Allen, 396 U.S. 168, 192, 90 S.Ct. 314, 327, 24 L.Ed.2d 345 (1969). Our review is limited to whether BPA's interpretation of the Act is reasonable. Columbia Basin, 643 F.2d at 600. Only if BPA's interpretation is unreasonable may we conclude that BPA's contract offers violate the Act.
 
 II.
 The Preference
 
 18
 Giving all due deference to BPA's construction of the Act, we nevertheless find its interpretation unreasonable. We find that the explicit and longstanding preference retained in the Act controls rather than the ambiguous provisions relied upon by BPA to justify a change. Before examining the Act's legislative history and underlying purposes, we turn first to the express terms of the Act.
 
 A. Pertinent statutory provisions
 
 19
 1. Preference provisions: Section 5(a) of the Act provides that:
 
 
 20
 All power sales under this Act shall be subject at all times to the preference and priority provisions of the Bonneville Project Act of 1937. . . .
 
 
 21
 At Sec. 10(c), the Act further provides that:
 
 
 22
 Nothing in this Act shall alter, diminish, abridge, or otherwise affect the provisions of other Federal laws by which public bodies and cooperatives are entitled to preference and priority in the sale of federally generated electric power.
 
 
 23
 The Bonneville Project Act, 16 U.S.C. Sec. 832 et seq., requires that BPA give preference and priority to public bodies and cooperatives in selling power. 16 U.S.C. Sec. 832c(a). Thus, Secs. 5(a) and 10(c) of the Act explicitly reaffirm the preference to public bodies established by the Bonneville Project Act.
 
 
 24
 Preference provisions have been included in federal power acts since 1906. Fereday, The Meaning of the Preference Clause in Hydroelectric Power Allocation under the Federal Reclamation Statutes, 9 Envt'l L. 601, 610 (1979). BPA's allocation of power has been subject to the preference since the Bonneville Project Act was passed in 1937. It is undisputed in this case that BPA previously interpreted the preference provision to apply to nonfirm power as well as firm power. Thus, prior to offering the contracts now at issue, BPA allocated nonfirm power according to the preference after it had first allocated firm power according to the preference. BPA's pre-Act interpretation of the preference was consistent with this court's interpretation of a preference clause under an analogous statute. See Arizona Power Pooling Association v. Morton, 527 F.2d 721, 725 (9th Cir. 1975), cert. denied, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976) (holding that a similar preference clause in the Reclamation Project Act of 1939, 43 U.S.C. Sec. 485(h)(c), applied to sales of thermally generated electrical power).
 
 
 25
 Any modification of the preference, in view of its long history and clear reaffirmation in the Act, should be explicit. See generally New England Power Co. v. New Hampshire, ---- U.S. ----, ----, 102 S.Ct. 1096, 1102, 71 L.Ed.2d 188 (1982) (courts 'have no authority to rewrite . . . legislation based on mere speculation as to what Congress 'probably had in mind").
 
 
 26
 2. Basis for BPA's interpretation: BPA's interpretation is based on the assumption that Sec. 5(d)(1)(A) of the Act requires giving the DSIs priority to nonfirm energy for their first quartile. Subsection 5(d)(1)(A) provides that:
 
 
 27
 The Administrator is authorized to sell in accordance with this subsection electric power to existing direct service industrial customers. Such sales shall provide a portion of the Administrator's reserves for firm power loads within the region. (emphasis added).
 
 
 28
 Section 3(17) of the Act defines 'reserves' as the power needed to avert shortages for the benefit of firm power customers.[3] To evaluate the BPA's conclusion, it is first necessary to consider the manner in which nonfirm energy is initially allocated.
 
 
 29
 The sale of nonfirm energy is contingent on availability. When sufficient nonfirm power is available, BPA provides it as needed to both the preference customers and DSIs. When, however, there is insufficient nonfirm energy to fill the needs of both types of users, the preference clause appears on its face to mandate, and, as previously interpreted by the BPA, did require, that the nonfirm energy needs of the preference customers be met before the nonfirm needs of the DSIs. Application of the preference in this manner interrupts the flow of nonfirm power to the DSIs. BPA and the DSIs argue that this process violates Sec. 5(d)(1)(A) because it makes the DSI's nonfirm power a reserve for the preference customers' nonfirm needs.
 
 
 30
 The BPA and DSIs' reasoning is flawed. Although applying the preference may deprive the DSIs of nonfirm power, that does not constitute using reserves for nonfirm loads. This so-called interruption results from insufficient energy to make the initial allocation of nonfirm power to the DSIs, not from the use of energy already allocated to the reserve. It is meaningless to speak of interrupting the flow of power that has not yet been allocated. No customer has an expectation of receiving any nonfirm power until BPA allocates it. The power allocated to the DSIs' first quartile serves as a reserve for firm loads because it may be interrupted on a few moments notice if, for example, the demand for firm power peaks. See note 3, supra. It is a non sequitur to conclude from the fact that the reserve cannot be used for nonfirm needs that the nonfirm energy cannot initially be allocated to the preference customers in accordance with the preference.
 
 
 31
 The only reasonable interpretation of Sec. 5(d)(1)(A) that is consistent with the preference is that the initial allocation of nonfirm power is no less subject to the preference than firm power. Nonfirm power does not become part of the reserve in the DSI load unless there is nonfirm power in excess of the amounts needed by the preference customers. When there is no surplus over the amount needed by the preference customers there can be no provision to the DSIs and, thus, no reserve created. When, however, there is sufficient energy to provide nonfirm power to both the preference customers and DSIs, the nonfirm power allocated to the DSIs becomes a reserve for firm loads. If, for example, a preference customer's firm load peaked above BPA's firm power resources so that BPA's obligation exceeded its ability to furnish firm power, BPA would meet the peak demands with energy from DSI's reserves. This straight-forward construction is preferable because it harmonizes what would otherwise be conflicting provisions of the Act. See generally Erlenbaugh v. United States, 409 U.S. 239, 244, 45, 93 S.Ct. 477, 480, 81, 34 L.Ed.2d 446 (1972); Clark v. Uebersee Finanz-Korp., 332 U.S. 480, 488-89, 68 S.Ct. 174, 177-78, 92 L.Ed. 88 (1947).
 
 
 32
 Moreover, even if Sec. 5(d)(1)(A) could be construed as creating an exception to the preference, BPA's interpretation is unreasonable given the clear preference provisions to the contrary. Section 5(d)(1)(A) specifies only that the reserve shall be used for firm power loads; it says nothing about the provision of nonfirm energy. To accept BPA's interpretation, we would have to infer that the interruption of the DSI nonfirm power that would result from the application of the preference when there is insufficient power for all users is equivalent to using reserves for nonfirm loads. We would also have to infer that any allocation of nonfirm power that might interrupt the flow of nonfirm power to the DSIs is not subject to the preference. It is unreasonable to assume that Congress intended to create such a significant exception to the preference through the indirect device of a provision referring to reserves.[4] We discern no basis in the explicit preference provisions of the Act for differentiating between the preference accorded nonfirm and firm power. We believe that if Congress had intended to override its twice-expressed and explicit preference mandate it would have spoken more directly.
 
 
 33
 Although the language of the Act appears clear, and thus controlling, we briefly examine the Act's history and purpose to see if they are consistent with what appears, on the Act's face, to be Congress' clear intent.
 
 B. Legislative History
 
 34
 The legislative history does not provide clear support for either side. Thus, although the preference to public utilities is explicitly recognized,[5] we acknowledge that there are also statements supporting BPA's interpretation.[6] It is unfortunate that the legislative history fails to give a clearer indication of Congressional intent. The inconsistent character of the legislative history is reflected several places in the Act, leading inevitably to burdensome resort to the courts for interpretation.
 
 C. Purpose of the Act
 
 35
 Congress intended to achieve several purposes in the Act. It primarily intended to determine how federal power should be allocated and to give BPA authority to acquire power resources. See, e.g., H.R.Rep.No.976 (Part I), supra, at 27. In its allocation of power, Congress clearly manifested its intention to retain the preference clause. Id. The purpose of the preference is to give public bodies the benefit of public power, and to provide low-cost power to the greatest number of consumers. Fereday, supra, at 604, 632-33. Congress also intended to provide low-cost power to residential consumers of private utilities. H.R.Rep.No.976 (Part II), supra, at 34-35.
 
 
 36
 To effectuate these purposes, the Act contemplates that the DSIs will pay rates sufficiently high to cover BPA's cost of acquiring new resources and to subsidize the sale of low-cost power to residential customers of private utilities. The DSIs argue that the assurance of power to their first quartile was a necessary inducement for them to enter the contracts requiring them to pay significantly higher rates. We disagree. Congress provided an ample incentive for the DSIs to enter the new contracts. Many of the DSIs' prior contracts would have expired soon after the Act was passed and those DSIs would have had to pay higher rates for whatever replacement power they could find after the expiration of their contracts. H.R.Rep.No.976 (Part I), supra. at 28. The primary incentive for the DSIs to enter the contracts was the long-term security they gained from the new twenty-year contracts.[7]
 
 
 37
 Although there is no case authority directly on point, City of Santa Clara, California v. Andrus, 572 F.2d 660 (9th Cir.), cert. denied, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978) is instructive on the purposes and proper interpretation of a preference clause. In Santa Clara, the Secretary of the Interior, acting through the Bureau of Reclamation, 'banked' power produced pursuant to the Reclamation Project Act of 1939 (43 U.S.C. Secs. 375a, 387 89, 485 et seq.) with a non-preference customer instead of selling it directly to a preference customer. The Secretary argued that the arrangement was designed to enable him to supply the future needs of selected preference customers. 572 F.2d at 669. This court held that the provisional sale of power to a non-preference customer when a preference customer is ready and willing to buy it contravened the purpose of the preference because the non-preference customer would profit from low-cost power at the expense of the preference customer. Id. at 670-71. Although the court recognized that the ultimate goal of the Secretary's scheme was consonant with the preference clause, it nevertheless found that the interim effect was inconsistent with the preference clause, and, therefore, held the scheme invalid.
 
 
 38
 The contention in the present case that the sale of nonfirm energy to DSIs serves the preference clause by creating reserves and earning revenue that can reduce the rates of all preference customers is answered by Santa Clara. BPA's policy may serve the preference clause, but the immediate effect, like that in Santa Clara, is antithetical to preference rights, and, therefore, is not consonant with the preference clause.[8] The fact that BPA's policy may enable it to profit more from selling the nonfirm energy to the DSIs and that all of its customers would thereby benefit does not persuade us that its interpretation is reasonable. As explained in Santa Clara, the purposes of the Act and its preference clause are best served by an interpretation that ensures the sale of power to preference customers. BPA's interpretation to the contrary, without explicit Congressional direction, contravenes the purposes of the preference clause. CONCLUSION
 
 
 39
 Congress strongly reaffirmed in the Act the longstanding preference given to public bodies in the sale of federal power. The Act contains no explicit direction from Congress to create an exception to the preference with respect to the provision nonfirm power to DSIs. We hold that BPA's interpretation is unreasonable because it contravenes the longstanding preference explicitly continued under the Act and is without express statutory support.[9] Accordingly, we remand the matter to BPA with directions for further action consistent with this opinion.
 
 
 
 [1]
 BPA plans its future power resources on the assumption that during some periods the water levels used to generate power will be low or 'critical.' BPA plans on having at least the amount of power that it can produce at a critical water level and that power is therefore firm power. When the water level is greater than critical, the power generated from the excess water is nonfirm energy
 
 
 [2]
 Four provisions in the contracts effectuate this interpretation. Section 7(c) provides that sales will be made to the first quartile prior to other sales of nonfirm energy. Section 7(e) provides that the adjustments for energy already used by the first quartile may not be made for sales of nonfirm energy to preference customers. Section 8(a)(2) provides that BPA will not sell nonfirm energy if it can be used for the first quartile. Section 8(c)(9) provides that BPA will attempt to acquire additional energy before requiring DSIs to repay energy advanced to the first quartile
 
 
 [3]
 BPA contracts to provide the DSIs with power. If, however, a power plant outage occurs or energy use peaks, for example, so that BPA could not meet its firm obligations, BPA would interrupt its service to the DSIs and use the power then available to serve its other loads. In this way, the power allocated to the DSIs serves as a reserve
 
 
 [4]
 BPA and the DSIs argue that BPA informed Congress of its proposed interpretation of the Act while the Act was still pending and that, in passing the legislation, Congress accepted BPA's interpretation. We rejected a similar argument in Arizona Power Pooling, supra, where the agency authorized to allocate federal power argued that Congress had indirectly 'approved' an exception to the preference through actions it had taken in regard to annual appropriations for the project at issue in that case. Although it was undisputed that Congress had taken certain actions in passing appropriations that supported the agency's decision not to sell interim power to a preference customer, this court concluded that:
 [t]his fact in and of itself does not justify the inference of congressional approval of purchase negotiations that were allegedly conducted in violation of the preference clause.
 527 F.2d at 726. The court went on to note that nothing in the record or legislative history indicated that Congress was aware that its actions on appropriations would be construed to affect preference rights. Id.
 Similarly, in the present case, there is no more indication that Congress was aware that BPA's interpretation would create an exception to the preference than there is that Congress intended to create such an exception through the indirect device of the reserve provision. Precise knowledge of the agency position is necessary to a finding that Congress ratified it. Id.
 
 
 [5]
 The House Committee of Interior and Insular Affairs stated in its Report 'it is not, however, a purpose to interfere in any way with, or modify the statutory rights of preference customers either within or without the region.' H.R.Rep.No.976 (Part II), supra, at 26, U.S. Code Cong. & Admin.News at p. 10114. See also Id. at 34. The House Committee on Interstate and Foreign Commerce responded in its report to concerns that the Act would change the meaning or applications of the preference. It stated that it did not want to undo nearly 80 years of history and that specific provisions were designed to protect the entitlement of preference customers to the full Federal base system. H.R.Rep.No. 976 (Part I), supra, at 26
 
 
 [6]
 Support for BPA's position can be found in Part II of the Report. It states that:
 Approximately 25 percent of the DSI load is to be treated as a firm load for purposes of resource operation . . .
 H.R.Rep.No.976 (Part II), supra, at 48, U.S. Code Cong. & Admin.News at p. 10136. The quartile referred to is the first quartile. Appendix B to the Senate Report provides that the first quartile:
 would be served with resources which are in excess of critical planning amounts but operated to meet the entire DSI load as if it were firm.
 S.Rep.No.272, 96th Cong. 2d Sess. 59 (1980). The following sentence in the appendix to the Senate Report, however, indicates the ambiguity in Congress' direction to treat the first quartile as firm. It provides:
 The operation of the System to carry out this purpose results from treating as a firm load the maximum amount of the DSI load (not all of which can be covered under critical streamflow planning), to the extent that this maximum load can be met in the initial period of the PNW Coordination Agreement Critical Period while protecting firm loads against the worst historical streamflow and maintaining an ability to restrict an equivalent amount of the DSI loads in the later periods (without provisional or advance energy being made available for this amount of the DSI load).
 Id. The above-quoted sentence refers to a plan called Firm Energy Load Carrying Capability by which BPA borrows power from future years on the probability that there will be greater than critical water levels. The sentence indicates that treating the DSI load as firm means using only this plan to meet the DSIs needs. This is particularly evident in the provision that BPA need not supply the amount of power borrowed from future years if the water levels are low.
 The reference to 'treating the DSI load as firm in the operation' is ambiguous because the first quartile cannot be treated as firm entirely. Unlike firm power, it is interruptible and subject to priorities. If the first quartile does not have all the attributes of firm power in the context of operations, the phrase 'treat as firm' does not indicate what firm attributes the first quartile has.
 
 
 [7]
 Although we ultimately hold for the preference customers, we note that we do not find persuasive their argument that BPA's interpretation is unreasonable because it provides a disincentive for them to build new power facilities. The incentives that Congress provided preference customers for constructing power facilities are that: (1) they can receive credit on their current power bill for the cost of constructing facilities that reduce BPA's obligation to acquire resources (Act at Sec. 6(h)); or (2) they can sell the capacity to BPA at a reasonable price while paying low federal rates for power (Act at Secs. 6(a)(2), 6(i)(2), 7(b)(1)). Congress, the body authorized to do so, provided ample incentives, irrespective of the preference clause's application to nonfirm power
 
 
 [8]
 BPA's reliance on Volunteer Electric Cooperative v. Tennessee Valley Authority, 139 F.Supp. 22 (E.D.Tenn.1954), aff'd mem., 231 F.2d 446 (6th Cir. 1956) is misplaced. In Volunteer, TVA sold directly to an industrial customer instead of allowing its preference customer to serve the industry and gain the profit. The court held that TVA could serve the industry directly because the benefit would be shared by all customers, not just the one utility, and that that approach served the Act's purpose to provide low-cost power. The present case is not one in which a preference customer profits from selling power acquired through the preference to the industries who also want the power. Here, the preference customers want the low-cost power for their customers. To the extent that Volunteer holds that the power agency may bypass the preference if the by-pass benefits all of its customers, Volunteer is contradicted by Santa Clara
 
 
 [9]
 Because we find that the priority given the DSIs for nonfirm power violates the preference provisions of the Act, we do not reach two remaining issues. We need not determine whether the new contracts violate Sec. 5(d)(1)(B) by providing the DSIs more power than they were entitled to under their 1975 contracts. Similarly, whether BPA failed to follow required procedures in adopting its interpretation of the Act is moot in light of our holding that the interpretation is unreasonable