CALIFORNIA ENERGY RESOURCES CONSERVATION AND DEVELOPMENT COMMISSION, Petitioner,

v.

Peter T. JOHNSON, Administrator of the Bonneville Power Administration, Respondent,

and

Pacific Power and Light Company, et al., Intervenors.

No. 81–7809.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 1985.

Decided Feb. 24, 1986.

Modified Jan. 13, 1987.

William M. Chamberlain, Gen. Counsel, Daniel W. Meek, John D. Chandley, Deputy Gen. Counsel, Arlene L. Khien, California Energy Com'n., Sacramento, Cal., for petitioner.

Charles H. Turner, U.S. Atty., Jack G. Collins, Chief, Civ. Div., Thomas C. Lee, Asst. U.S. Atty., Kurt R. Casad, Sp. Asst. U.S. Atty., Harvard P. Spigal, Gen. Counsel, John A. Cameron, Jr., Asst. Gen. Counsel, Portland, Or., for respondent.

M. Laurence Popofsky, Dian M. Grueneich, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., Eric Redman, Heller, Ehrman, White & McAuliffe, Seattle, Wash., for Direct Service Indus. Customers.

Donald N. Furman, Portland Gen. Elec., Portland, Or.

Daniel O. Flanagan, Mont. Power, Butte, Mont.

John Wiley Gould, CP Nat. Portland, Or.

John Daniel Ballbach, Puget Sound Power & Light, Seattle, Wash.

George Galloway, Pacific Power & Light, Portland, Or.

Gary A. Dahlke, Wash. Water Power, Spokane, Wash.

Douglas S. Little, Idaho Power Co. & Utah Power & Light Co., Seattle, Wash., for Inv. Owned Utilities.

Before TANG and FARRIS, Circuit Judges, and KELLEHER,* District Judge.

## MODIFIED OPINION

FARRIS, Circuit Judge:

Respondent Bonneville Power Administration is a self-financing power marketing agency within the United States Department of Energy. Since the enactment of the Bonneville Project Act of 1937, 16 U.S.C. §§ 832–832*l*, it has marketed the inexpensive hydroelectric power generated by facilities along the Columbia River. BPA sells electric power to numerous utilities, both publicly owned and private-investor owned, as well as to direct service industrial and government customers, primarily in the Pacific Northwest.

In 1980, Congress adopted the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. §§ 839–839h, to avert protracted and unproductive litigation over the finite supply of inexpensive federal hydroelectric power. *See Aluminum Company of America v. Central Lincoln Peoples' Utility District*, 467 U.S. 380, 104 S.Ct. 2472, 2478, 81 L.Ed.2d 301 (1984). This "Regional Act" required that within 9 months of the effective date of the act BPA "commence necessary negotiations for, and offer, initial long-term contracts" with its various classes of customers. 16 U.S.C. § 839c(g). BPA completed negotiations and offered these contracts on August 28, 1981.

Under the Regional Act, the contracts, once offered, were reviewable upon petition filed within 90 days. 16 U.S.C. § 839f(e)(5). The contracts generated considerable litigation. *See e.g., Aluminum Company*, 104 S.Ct. 2472; *Forelaws on Board v. Johnson*, 743 F.2d 677 (9th Cir.1984);[1] *Public Power Council v. Johnson*, 674 F.2d 791 (9th Cir.1982). This is the last of the Regional Act contract challenges to be submitted for decision.

While the contracts offered BPA's various customers differ in particulars, they share standard "general contract provisions" challenged en masse in this action. Thus, petitioner CEC contends (1) that section 4 of the standard residential exchange contract violates sections 6(b)(1) and 6(b)(3)

---

* Honorable Robert J. Kelleher, Senior United States District Judge for the Central District of California, sitting by designation.

1. In *Forelaws*, we held that BPA was required to prepare an Environmental Impact Statement

with respect to the contracts, but declined to enjoin operation of the contracts pending completion of the initial EIS. CEC concedes that in light of *Forelaws* we need not address its NEPA-based challenge to the contracts.

of the Regional Act, 16 U.S.C. §§ 839d(b)(1) and (3), "by committing BPA to acquire noneconomical resources;" (2) that power sales contract general provision 8(h) violates section 7(i) of the Regional Act, 16 U.S.C. § 839e(i), by establishing a rate without conforming to the prescribed rate-making procedures; (3) that power sales contract general provision 8(f) violates section 7(i) by establishing a method of cost allocation without conforming to the prescribed procedures; and (4) that power sales contract general provision 42(c) is void and unenforceable as it binds BPA to ignore future congressional modification of federal law governing priorities in access to BPA power.

Section 9(e)(5) of the Regional Act provides that "[s]uits to challenge ... final actions ... taken pursuant to [the Act] ... shall be filed in the United States court of appeals for the region." 16 U.S.C. § 839f(e)(5). The contract offers challenged here constitute "final actions" within the meaning of section 9(e)(5). *Central Lincoln Peoples' Utility District v. Johnson*, 686 F.2d 708, 710 (9th Cir.1982), *rev'd on other grounds, sub nom. Aluminum Company of America v. Central Lincoln People's Utility District*, 467 U.S. 380, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984).

BPA's interpretation of the Regional Act "is to be given great weight." *Aluminum Company*, 104 S.Ct. at 2479–80. The regulated subject is technical and complex. BPA has longstanding expertise in the area and participated in drafting the Regional Act. *See Zuber v. Allen*, 396 U.S. 168, 192, 90 S.Ct. 314, 327, 24 L.Ed.2d 345 (1969). The BPA construction of the Regional Act thus constitutes "a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are untried and new." *Udall v. Tallman*,

380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

To uphold the challenged contract provisions, we need not find that BPA's construction of the relevant provisions of the Regional Act is the only reasonable construction of said provisions or even that said construction is the one we would have adopted had construction been committed to the judiciary in the first instance. *Aluminum Company*, 104 S.Ct. at 2480; *American Paper Institute, Inc. v. American Electric Power Corp.*, 461 U.S. 402, 422–23, 103 S.Ct. 1921, 1932–33, 76 L.Ed.2d 22 (1983). We need only conclude that BPA's interpretation of the Regional Act, as reflected in the challenged contract provisions, is reasonable. *Aluminum Company*, 104 S.Ct. at 2480. "Only if BPA's interpretation is unreasonable [should the court] conclude that BPA's contract offers violate the [Regional] Act." *Central Lincoln*, 686 F.2d at 711.

On the limited record before us, we cannot conclude that section 4 of the standard residential exchange contract reflects an unreasonable interpretation of the pertinent provisions of the Regional Act.[2] The remaining contentions raised by petitioner are not ripe for judicial review. Accordingly, we dismiss the petition without reaching the merits insofar as petitioner challenges general contract provisions 8(h), 8(f), and 42(c).

## RESIDENTIAL EXCHANGE CONTRACT SECTION 4

Section 5(c) of the Regional Act, 16 U.S.C. § 839c(c), establishes a "residential exchange" program designed to temper the inequity of the preference system mandated by the Bonneville Project Act of 1937, 16 U.S.C. §§ 832–832*l*. *See Aluminum Company*, 104 S.Ct. at 2484. The allocation of cheap federal power under the preference

---

**2.** To the extent the in-lieu-purchase provisions of the residential exchange contracts allegedly bind BPA to purchase costly power in violation of the cost effectiveness provisions of the Regional Act, 16 U.S.C. § 839b(e)(1), CEC, as an agency responsible for energy planning in a state that purchases substantial amounts of energy from BPA, has standing to obtain review of these provisions. *See California Energy Resources Conservation and Development Commission v. Bonneville Power Administration*, 754 F.2d 1470, 1473–74 (9th Cir.1985).

system heavily favored public utilities (preference customers) over private, investor-owned utilities (nonpreference customers). Consequently, consumers living in areas served by private utilities faced higher power prices than consumers living in areas served by public utilities. Under the residential exchange program, any Northwest utility with high system costs may sell power to BPA at their average system cost, then purchase from BPA an equal quantity of low cost federal power. The benefits to the participating utilities under this program are to be passed on directly to residential customers. *See Aluminum Company,* 104 S.Ct. at 2484. The cost of this "money-losing program," *id.,* is largely borne by BPA's direct-service industrial customers. *See* 16 U.S.C. § 839e(c)(1).

Section 5(c)(5) of the Regional Act authorizes BPA to purchase low cost power in lieu of power offered by a utility under the exchange program:

Subject to the provisions of sections 839b and 839d of this title, in lieu of purchasing any amount of electric power offered by a utility under [the residential exchange program], the Administrator may acquire an equivalent amount of electric power from other sources to replace power sold to such utility as part of an exchange sale if the cost of such acquisition is less than the cost of purchasing the electric power offered by such utility.

16 U.S.C. § 839c(c)(5).

Under section 4(a) of the standard exchange contract, BPA agrees to give a utility participating in the exchange program "not less than seven years prior written notice" of its intent to acquire power from a less expensive source in lieu of

purchasing some amount of power offered by the exchanging utility. Section 4(a) also requires that the substituted acquisition "be at least five years in duration." [3]

CEC contends that section 4 violates sections 6(b)(1) and 6(b)(3) of the Regional Act, 16 U.S.C. §§ 839d(b)(1) and (3). Section 6(b)(1) provides:

[A]cquisition of resources under this chapter shall be consistent with the plan, as determined by the Administrator.

Section 6(b)(3) provides:

If no plan is in effect, the Administrator may acquire resources under this chapter which are determined by the Administrator to be consistent with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title.

■ The plan referred to is the "regional conservation and electrical power plan" required to be prepared and adopted by the Pacific Northwest Electric Power and Conservation Planning Council within two years of establishment of the Council. While the parties have neglected to furnish details as to the contents of the plan, if any, adopted by the Council, it is clear that either under the plan or in the absence of a plan, resource acquisition must be consistent with the mandate that priority be given to resources determined to be "cost-effective." 16 U.S.C. § 839b(e)(1).

■ CEC contends that by requiring seven years' prior notice of BPA's intent to acquire low cost power in lieu of exchange power, exchange contract section 4 violates the cost-effectiveness principle and is therefore unlawful. Similarly, CEC contends that the "§ 4 requirement that BPA for at

---

**3.** Residential exchange contract § 4(a) provides:
4. *In Lieu Purchase by Bonneville.* (a) In lieu of purchasing all or a portion of the electric power referred to in section 2 above, Bonneville may acquire an equivalent amount of electric power from other sources if the cost of such acquisition is less than the cost of purchasing the electric power referred to in section 2. For the purpose of determining the cost of any such in lieu purchase, transmission and production costs, and transmission losses, as determined by Bonneville,

shall be included. Bonneville shall give the Utility not less than seven years prior written notice of Bonneville's intent to use such acquisition in lieu of purchasing all or a portion of the electric power referred to in section 2 above. This notice shall state the amount, duration, source, estimated cost and estimated scheduling provisions of the intended acquisition. Any intended acquisition shall be at least five years in duration.
46 Fed.Reg. 44,391 (1981).

least 7 years continue to receive and pay for exchange resources that are not the least costly available resource [sic] is also inconsistent with the [Regional] Act's underlying purpose 'to assure the Pacific Northwest of an adequate, efficient, economical, and reliable power supply.'" BPA's direct-service industrial customers join CEC in challenging exchange contract section 4. However, they request not a declaration that section 4 is unlawful, but a judicial "reaffirmation," of unidentified form, of the "statutory limits on BPA's authority to purchase power."[4] We first consider whether BPA has any affirmative duty under section 5(c)(5) of the Regional Act to substitute in-lieu sales for exchanges of power, and in what circumstances. The courts must be the final authorities on questions of statutory interpretation. *Fagner v. Heckler,* 779 F.2d 541, 543 (9th Cir.1985).

Section 5(c)(5) provides that BPA "may" substitute in-lieu sales for exchanges, as long as the power sold to the utility comes at a lower cost than the power the utility offers for exchange. The statute only authorizes substitution; it does not indicate when in-lieu sales are appropriate. No reference to section 5(c)(5) or its underlying purpose appears in the legislative history of the Act. We conclude that it is entirely within the discretion of the BPA to determine how and when the substitution of direct sales for exchanges should take place.

CEC and BPA's direct-service industrial customers suggest that the in-lieu sales provision of section 5 has a distinct purpose, and that it implicitly places a duty on BPA to make in-lieu sales in specific circumstances. They argue that section 5(c)(5) is an integral part of Congress' plan to provide cost-effective power to the Northwest, and that BPA is obligated to cease its exchange program and buy power from a competing supplier when the cost of

alternative power is lower than the cost of exchange power.

We reject this interpretation of the statute. If 5(c)(5) were applied in this manner, there would be no residential exchange program. The exchanges contemplated by section 5 could take place only where no competing supplier could undersell the exchanging utility. Yet where there is no power available at a lower price than the exchanging utilities' prices, there would be no need for the exchange program. Such a program would not "provide rate relief for consumers serviced by [nonpreference customers]," *Aluminum Company,* 104 S.Ct. at 2484, as only those served by the lowest priced utilities would be permitted to enjoy the exchange program rate subsidy. By insisting that cost-effectiveness is the primary goal, CEC refuses to acknowledge that the residential exchange program is, and is meant to be, a "money-losing program." *Aluminum Company,* 104 S.Ct. at 2484.

Moreover, in-lieu purchases have only a very limited usefulness. Utilities that have offered power to BPA for exchange already have the power they need, and could not benefit from actual purchases of power from BPA even at a low rate. BPA's offer of low-cost power to utilities that will not accept it is of no value to the utilities' residential customers, the intended beneficiaries of the Act. Although CEC would make it the focus of Congress' plan in the Regional Act, section 5(c)(5) is but a minor feature of the exchange program created in section 5.

CEC concedes that section 5(c)(5) "allows but does not require BPA ... to make in-lieu purchases." CEC argues, however, that "[a]lthough section 5(c)(5) by its terms does not require economic in-lieu purchases, it nevertheless expressly reaffirms the governance of sections 4 and 6 over all resource acquisitions." As CEC sees it,

---

**4.** Unlike CEC's challenges to power sales contract general provisions 8(h), 8(f), and 42(c), CEC's challenge to § 4 of the residential exchange contract is appropriate for judicial resolution. The issue tendered is a purely legal one bearing no factual component. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). No future factual development could better frame the issue for informed judicial resolution.

section 5(c)(5) explicitly incorporates the cost-effectiveness requirement of section 4(e)(1) of the Regional Act, thereby requiring BPA to refrain from purchasing power from exchanging utilities whenever lower cost power is available from other sources. The wording of section 5(c)(5) belies this contention.

Section 5(c)(5), 16 U.S.C. § 839c(c)(5), does refer to sections 4 and 6 of the Regional Act, 16 U.S.C. §§ 839b and 839d, but the reference cannot be construed as CEC suggests: "Subject to the provisions of sections 839b and 839d ... the Administrator may acquire [low cost power in lieu of exchange power]." The opening clause ("Subject to the provisions of section 839b and 839d") is dependent upon the subject/predicate of the sentence ("Administrator may acquire"). Thus, acquisitions of "in-lieu" power, not residential exchanges, are subject to the provisions of sections 839b and 839d.

■ The permissive language and the absence of any legislative history lead us to conclude that the implementation of section 5(c)(5) is completely within the discretion of the BPA, over the suggestion of CEC and others that the section is in some sense mandatory on the agency. This does not close the issue, since CEC and others argue, in effect, that BPA has abused the discretion granted in 5(c)(5). If, by incorporating a seven-year notice requirement in its standard exchange contract with utilities, BPA has completely precluded itself from ever making in-lieu purchases, it has abused its discretion under 5(c)(5). This is an issue of fact, upon which CEC and BPA's direct-service industrial customers have the burden of proof. They have not shown, however, that the notice requirement of contract section 4(a) amounts to a complete ban on in-lieu sales of power, nor could they. By its terms section 4(a) allows the substitution of sales for exchanges of power under certain circumstances. To prove an abuse of discretion, CEC would have to show not that BPA will never make direct sales in lieu of exchange, but that BPA is contractually incapable of doing so. It fails to carry that burden.

GENERAL CONTRACT PROVISION 8(h)

Regional Act section 7(i), 16 U.S.C. § 839e(i), prescribes procedures that must be followed by BPA in establishing rates. Notice in the Federal Register is to be followed by one or more hearings conducted by a hearing officer to develop a complete record and receive public comment. The final rate decision of the BPA administrator, based upon the record, becomes effective only upon confirmation and approval of the rates by the Federal Energy Regulatory Commission.

CEC contends that general contract provision 8(h) establishes a rate without observing the requirements of section 7(i). General provision 8(h) applies to any customer from whom, or on behalf of whom, BPA has acquired a resource, to the extent such customer purchases firm power from BPA at a rate established pursuant to section 7(f) of the Regional Act, 16 U.S.C. § 839e(f). ("Firm power" is provided with the assurance of continued availability to meet a customer's load requirements. "Nonfirm power" is supplied subject to interruption; it is provided only when supply exceeds firm power commitments. *Aluminum Company*, 104 S.Ct. at 2477.) Paragraph 8(h)(2) provides:

> The rate established pursuant to section 7(f) charged to any such Customer for an amount of Firm Power not exceeding that acquired by Bonneville from or on behalf of such Customer ... shall not exceed the average cost of the resources acquired by Bonneville from such Customer.... The average cost of such resources shall be adjusted for any additional costs such Customer would have incurred in order to provide itself the same quantity and quality of power from such resources if such resources had not been acquired by Bonneville.

46 Fed.Reg. 44,368 (1981).

BPA contends that provision 8(h) is entirely legal as paragraph 8(h)(3) "requires BPA to conduct a rate hearing before the

utility efficiency principle of [general contract provision] 8(h) is implemented." Paragraph 8(h)(3) provides:

> Bonneville shall develop a methodology for performing the adjustments required by paragraph (2) by procedures comparable to those employed in establishing the methodology referred to in subsection (e) above.

46 Fed.Reg. 44,368 (1981). Subsection 8(e) provides:

> Bonneville's wholesale power rates established on any Rate Adjustment Date date shall be developed consistent with the provisions of section 7 of [the Regional Act]. Bonneville shall develop in consultation with its utility Customers and shall publish by July 1, 1983, methodologies as required for implementing section 7(b)(2).

46 Fed.Reg. 44,367 (1981).

Without challenging BPA's contention that paragraph 8(h)(3) requires compliance with the section 7(i) procedures prior to implementation of the 8(h) rate ceiling, CEC argues that even pre-implementation compliance is inadequate. Once the contracts have been executed, so the argument goes, a subsequent ratemaking hearing is merely a formalistic exercise in which BPA goes "through the motions of a rate case in order to sanctify what it has contractually agreed to do." The existence of provision 8(h) would prevent BPA from acting freely and fairly during a subsequent ratemaking hearing: "A party who wishes to dispute the wisdom of what the contract provision requires would ... have to convince BPA not only that a change in policy is wise, but also that it is worth risking a possible breach of contract action to proceed as the party suggests."

BPA assures us "that it will not implement [general contract provision] 8(h) without first conducting a hearing pursuant to [Regional Act] section 7(i)."[5] Rates thus established would be submitted to FERC for confirmation and approval. 16 U.S.C. § 839e(a)(2). They could then be reviewed in this court. 16 U.S.C. § 839f(e). In any case, BPA assures us that for the "foreseeable future ... there is little likelihood that [general contract provision] 8(h) will be implemented because of the long-term power surplus in the Pacific Northwest."

That BPA can make such a statement reveals that this question is not ripe for decision.[6] General contract provision 8(h) has never been implemented. No actual rate made in violation of section 7 of the Regional Act is being challenged in this action. Rather, CEC challenges a contract provision, entirely dormant to date, that seems to set limits within which rates will perhaps someday be established. Petitioner has not even alleged that there actually has been a ratemaking proceeding in which BPA officials have hesitated to adopt particular rate proposals for fear that such adoption would subject BPA to suit on the basis of provision 8(h). A decision at this juncture would resolve a dispute about hypothetical rates. "Courts have no business adjudicating the legality of non-events." *National Wildlife Federation v. Goldschmidt,* 677 F.2d 259, 263 (2d Cir. 1982).

In *Association of National Advertisers, Inc. v. F.T.C.,* 617 F.2d 611 (D.C.Cir.1979), advertisers and advertising trade associations sought interlocutory review of special

---

5. BPA's assurance that it will not implement general provision 8(h) without adhering to the procedural requirements of § 7(i) is immaterial. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 154, 87 S.Ct. 1507, 1518, 18 L.Ed.2d 681 (1967) ("This action at its inception was properly brought and [the] subsequent representation of the Department of Justice [that it would not enforce the challenged regulation through criminal prosecution] should not suffice to defeat it.").

6. That the parties have not questioned the ripeness of an issue does not preclude a court from reaching the question of ripeness. *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 138, 95 S.Ct. 335, 355, 42 L.Ed.2d 320 (1974) ("[B]ecause issues of ripeness involve, at least in part, the existence of a live 'Case or Controversy,' we cannot rely upon concessions of the parties and must determine whether the issues are ripe for decision in the 'Case or Controversy' sense.").

rules pertaining to proceedings on television advertising directed at children. The crux of the complaint was that section D(2)(e) of the pertinent Notice of Proposed Rulemaking, 43 Fed.Reg. 17,967 (1978), when applied, would "unlawfully burden [appellants'] right to participate in the proceeding and [would] accomplish a deprivation of certain unexplained first amendment interests." 617 F.2d at 620. The court of appeals found that the challenge to section D(2)(e) was not ripe for review:

> [A]ppellants' request for relief would require us to engage in an essentially abstract discussion of the potential effects of Section D(2)(e). Not only is the record devoid of any instance in which a party wishing to participate in the proceeding has been concretely injured by application of the requirement, but indeed the record reveals no indication of any application of the requirement, but indeed the record reveals no indication of any application of the requirement at all. Equally important, although Section D(2)(e), as we noted above, is seemingly a condition precedent to being heard, we are aware of no incidence of parties avoiding participation or otherwise altering their behavior in consequence of the requirement. It may be that this provision *will* unlawfully burden the rights of parties to participate and *will* effect deprivations of constitutional rights, but in this situation, when the precise operation and impact of the requirement are unsettled, it is best for the judiciary to stay its hand until the provision in fact *does* result in the consequences appellants predict.

617 F.2d at 620–21 (emphasis in original).

Similarly, CEC's challenge to general contract provision 8(h) is not suitable for judicial resolution. The "basic rationale [of ripeness doctrine] is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and *its effects felt in a concrete way by the challenging parties.*" *Abbott Laboratories v.*

*Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) (emphasis added). *See also Arkansas Power & Light Co. v. I.C.C.,* 725 F.2d 716, 725–26 (D.C.Cir. 1984).

## GENERAL CONTRACT PROVISION 8(f)

■ CEC contends that general contract provision 8(f) is unlawful and unenforceable (1) because it purports to bind BPA to a particular method of ratemaking without compliance with the ratemaking procedures prescribed by section 7(i) of the Regional Act, 16 U.S.C. § 839e(i), and (2) because it requires the adoption of rates not based upon the cost of service in violation of section 7(g) of the Regional Act, 16 U.S.C. § 839e(g). General contract provision 8(f) provides:

> Power cost allocations among Customer classes will follow the same methods set forth in Appendix B of the Senate Report S. 885 (S.Rep. 272, 96 Cong., 1st Sess. 1979) for the period after July 1, 1985, and in the same general manner as further explained in the 1981 Bonneville wholesale power rate case by Exhibit U submitted in such rate case and the accompanying Bonneville testimony.

46 Fed.Reg. 44,367 (1981).

BPA contends that general provision 8(f) "simply references documents developed in BPA's 1981 rate hearing conducted pursuant to section 7(i)." BPA asserts that both Appendix B to S. 885 (the bill that became the Regional Act) and Exhibit U from the 1981 BPA ratemaking "were subjected to thorough review" in the 1981 proceedings. BPA represents that rate case parties cross-examined BPA witnesses regarding both documents during the 1981 hearings. Thus, BPA contends, the documents referenced in general contract provision 8(f) "were subjected to the full procedural requirements of a section 7(i) rate hearing."

CEC admits that the referenced documents were discussed during the 1981 ratemaking hearing, but contends that the discussion was specifically limited to the rate period ending in 1982: "No one who participated in that case could have antici-

pated the significance of Exhibit U and the accompanying testimony." Thus, we are told, general provision 8(f) "incorporated material from a rate proceeding for purposes well beyond the scope of that rate proceeding" without complying with the procedural requirements of section 7(i).

The factual question of whether the discussion of Appendix B and Exhibit U was limited to the rate period ending in 1982 need not be resolved at this juncture.[7] Section 7(i) does not require that contract provisions be adopted after full ratemaking proceedings. Rather, it requires that rates be set according to certain procedures. CEC does not challenge rates, it challenges contracts on the grounds that they require rates to be set in a manner inconsistent with section 7(i). CEC argues that general contract provision 8(f) attempts to bind BPA to a method of ratemaking "regardless of the relevant events or outcome of future rate hearings." Thus, we are told, future ratemaking hearings held pursuant to section 7(i) of the Regional Act will be meaningless, formalistic exercises as BPA is contractually obligated to make rate proposals consistent with general contract provision 8(f) and may not alter those proposals in response to party suggestions without fear of suit for breach of contract.

This argument is no more forceful here than it is as a challenge to general contract provision 8(h). CEC has not challenged a rate set in contravention of section 7(i) of the Regional Act. Instead, CEC challenges a provision in a contract between third parties, a provision that, so far as the record reveals, has not been construed by the parties. We cannot evaluate the challenged contract provision in a factual vacuum. CEC has not brought to our attention a single rate adopted in contravention of section 7(i). There are no facts before the court as to the effect of subsection 8(f) on the establishment of rates. We will not invalidate general contract provision 8(f) on

the ground that it limits BPA's discretion during ratemaking proceedings without some evidence, beyond CEC's speculation, that it does so.

CEC's contention that subsection 8(f) is unlawful because it requires the adoption of rates not based upon the cost of service is similarly flawed. Section 7(g) of the Regional Act, 16 U.S.C. § 839e(g), requires that BPA "equitably allocate to power rates, in accordance with generally accepted ratemaking principles and the provisions of this chapter, all costs and benefits not otherwise allocated under this section, including, but not limited to, ... the sale of or inability to sell excess electric power." According to CEC, the method of cost allocation established under general contract provision 8(f) "allocates all of BPA's costs to BPA's firm power sales, providing no cost basis for BPA's nonfirm surplus energy sales." CEC contends that this allows BPA "to develop an unlimited variety of rate methodologies to establish its non-firm rate," thus impairing CEC's planning functions by denying it any basis for projection of future BPA rates for nonfirm power. However, there is no evidence concerning rates adopted pursuant to subsection 8(f). We cannot determine whether BPA has allocated costs equitably when we have before us no rates or other evidence of actual cost allocation. The question, as presented, is simply not ripe for review.

## GENERAL CONTRACT PROVISION 42(c)

■ CEC contends that general contract provision 42(c) is void and unenforceable because it binds BPA to ignore future congressional modification of federal law governing priorities in access to BPA power. Under section 42(c):

Bonneville agrees that it will comply with all restrictions and requirements of the Provisions [of the Regional Preference Act, 16 U.S.C. §§ 837–837h], and

---

7. The original jurisdiction granted this court by § 9(e)(5) of the Regional Act, 16 U.S.C. § 839f(e)(5), raises procedural problems that will have to be resolved on a case-by-case basis. Because no factfinding is necessary in this case,

we treat it like a petition for administrative review. We express no opinion as to how the court should proceed where factfinding is necessary. *See Central Lincoln,* 686 F.2d at 710.

will perform all duties and obligations imposed on it by the Provisions, as the Provisions existed on the effective date of this contract, regardless of any subsequent modification, amendment or repeal of the Provisions.

46 Fed.Reg. 44,372 (1981). (The Regional Preference Act limits sales outside the Pacific Northwest to surplus power. 16 U.S.C. § 837a.) Section 42(c) is allegedly unlawful "because BPA does not possess authority to commit itself to ignore new Congressional directions as they may appear in amendments to federal statutes."

The elaborate arguments presented by the various parties are of no more than academic interest. The question raised is what the effect *would* be on existing contract rights if Congress *were* to amend or repeal the Regional Preference Act. Verbs are telling. Courts do not decide questions that can only be phrased in the subjunctive. As the regional preference scheme remains entirely intact, the validity of section 42(c) is not ripe for review.

CONCLUSION

As we have concluded that section 4 of the residential exchange contract reflects a reasonable interpretation of the pertinent provisions of the Regional Act, we enter judgment in favor of respondent Bonneville Power Administration insofar as this action constitutes a challenge to the legality of section 4 of said contract. As the remaining issues are not ripe for judicial decision, we dismiss the petition of the California Energy Resources Conservation and Development Commission insofar as said petition seeks review of power sales contract general provisions 8(h), 8(f), and 42(c).

AFFIRMED IN PART; DISMISSED IN PART.